# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

**Vanessa E. Springer,**                                              Civ. No. 12-3115 (MJD/AJB)

       Plaintiff,

                                 **REPORT AND RECOMMENDATION**

**v.**

**Carolyn W. Colvin,**[1]

**Acting Commissioner of Social Security,**

       Defendant.

_____

Lionel H. Peabody, Esq., P.O. Box 10, Duluth, MN 55801-0010, for Plaintiff.

Ana H. Voss, Asst. United States Attorney, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for the Commissioner.

ARTHUR J. BOYLAN, United States Chief Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g) Plaintiff Vanessa E. Springer ("Springer") seeks judicial review of the final decision of the Commissioner of Social Security.  This matter is before the undersigned Chief United States Magistrate Judge Arthur J. Boylan for a report and recommendation to the District Court on the parties' cross-motions for summary judgment [Doc. Nos. 15, 21].  *See* 28 U.S.C. § 636(b)(1) and Local Rule 72.1  Based on the reasoning set forth

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013. http://www.ssa.gov/pressoffice/factsheets/colvin.htm  She is substituted as the defendant pursuant to Fed.R.Civ.P. 25(d).

1

below, this Court recommends that Plaintiff's motion for summary judgment be granted [Docket No. 15], and Defendant's motion for summary judgment be denied [Docket No. 21].

## I.      PROCEDURAL HISTORY

Springer protectively filed an application for supplemental security income ("SSI") on October 27, 2009.  (Tr. 165, 138-44, 170.)[2]  Her application was denied.  (Tr. 59-63.)  A hearing was then held on May 2, 2011, before Administrative Law Judge ("ALJ") Thomas M. Donahue in West Des Moines, Iowa.  (Tr. 26-56.)  The ALJ issued an unfavorable decision on July 1, 2011.  (Tr. 8-25.)  Springer requested review of the ALJ's decision by the Appeals Council, and the Appeals Council denied Springer's request on October 18, 2012, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)  *See* 20 C.F.R. § 416.1481.  On December 14, 2012, Springer sought review from this Court.  The parties then filed cross-motions for summary judgment.

## II.     BACKGROUND AND MEDICAL EVIDENCE

Springer was in special education beginning in grade school.  (Tr. 212-24.)  At the age of six, her IQ score was 68; at age eleven, her IQ was 69; and at age fourteen, her IQ score was 70.  (Tr. 213-15.)  She had been referred for testing in first grade because she was extremely slow.  (Tr. 215.)  Repeat of first grade was recommended while she was placed on a waiting list for special education.  (Tr. 216.)  At age eleven, her word recognition and spelling were at a first grade level, and arithmetic was at a second grade level.  (Tr. 214.)  Her visual motor coordination was below average, and she needed much probing to elicit a response.  (*Id.*)  There was also concern for an emotional problem because she woke up at night and laughed

---

[2] The abbreviation "Tr." is used to cite the administrative record, Docket No. 10.

2

uncontrollably.  (Tr. 217.)  At age fourteen, she was at a third grade level of word recognition,

spelling and arithmetic.  (Tr. 213.)  She seemed to have difficulty finding words to express ideas

and was very slow in all response modalities.  (*Id.*)

As an adult, Springer held a few cleaning jobs from 1992 through 1995.  (Tr. 190.)

Springer said she worked part-time as a building receptionist from June 2001 through October

2003, but her duties were to make rounds to check the building security and to buzz people in.

(Tr. 190, 195.)  A vocational expert categorized the job as security guard.  (Tr. 211.)   Springer

became homeless in 2004, and later moved into transitional housing.  (Tr. 241, 249.)  Springer

also worked at various sorting jobs for short periods of time, including sorting newspapers from

September 2004 through December 2004, sorting foam from September through November

2005, and sorting newspapers again from May to August 2006.  (Tr. 190.)  Her last work was in

a temporary training program, sorting clothes at Goodwill, from May through August 2007.  (Tr.

171, 190.)

### A.    Mental Impairments

In September 2008, Springer had been living at Bethlehem Haven, a shelter in Pittsburgh,

for three weeks, and she was referred by staff for a psychiatric assessment due to stress.  (Tr.

249.)  Springer felt depressed and anxious about her homelessness.  (Tr. 243.)  She had a history

of difficulty focusing and concentrating, and she was preoccupied with having a learning

disability.  (*Id.*)  Springer reported moderate anxiety, poor memory, poor concentration,

hopelessness, and mild grief and worthlessness.  (Tr. 248.)  She felt her learning disability

prevented her from holding a job, leading to her homelessness.  (*Id.*)  She had poor job

performance in the past.  (Tr. 249.)  On examination, Springer was anxious, and her mood and

concentration were fair.  (Tr. 250.)  Her ability to count by serial 7s was poor.  (*Id.*)  Dr. Jurezak

diagnosed Anxiety Disorder, NOS and to rule out ADHD; other possible diagnoses were

borderline intellectual functioning, and mild mental retardation or learning disability.  (Tr. 250,

173.)  He assessed Springer with a GAF score of 45[3] and prescribed citalopram.  (Tr. 241.)

Later that month, Springer complained of increasing anxiety.  (*Id.*)  She had tried going

to college but was unable to finish.  (*Id.*)  When she was feeling overwhelmed, her heart raced,

and she had butterflies in her stomach.  (*Id.*)  She wanted medication to help her sleep.  (*Id.*)  On

October 8, 2008, Springer was anxious, causing her to wake up at night.  (Tr. 240.)  Her

citalopram was increased.  (*Id.*)  A few weeks later, she was also prescribed Klonopin.  (Tr. 239-

40.)

The following month, Springer felt calmer as a result of the medications.  (Tr. 238.)

Nonetheless, staff at the shelter noted that Springer had poor social skills and bizarre behavior.

(Tr. 238.)  In January 2009, Springer's medication was reduced when she complained of being

tired.  (Tr. 236-37.)  Springer wanted to enroll in a course to obtain a nutrition certificate.  (*Id.*)

In February, she was taken off Klonopin but continued on citalopram.  (Tr. 235.)  Her anxiety

was well-controlled.  (*Id.*)

Springer started an internship a dietary department in a hospital in March 2009.  (Tr.

232.)  In April, she completed her hospital internship and would start "preclasses" in math and

---

[2] The Global Assessment of Functioning Scale, a scale of 0 to 100, is used by clinicians to
subjectively rate the social, occupational and psychological functioning of adults.  *Diagnostic
and Statistical Manual of Mental Disorders* ("DSM-IV-tr") 32 (American Psychiatric
Association 4th ed. text revision 2000).  Scores between 41 and 50 indicate serious symptoms or
any serious impairment in social, occupational, or school functioning.  *Id.* at 34.  Scores between
51 and 60 indicate moderate symptoms or moderate difficulty in social, occupational, or school
functioning.  *Id.*  Scores between 61-70 indicate some mild symptoms or some difficulty in
social, occupational, or school functioning.  *Id.*

writing the next month.  (Tr. 234.)  She was still anxious but also cheerful and goal-directed.  (*Id.*)  In May, she denied feeling anxiety, and her mood and sleep were fair.  (Tr. 233.)  Her classes would start soon, three times a week, and she was worried about her math deficiencies.  (*Id.*)

Springer's anxiety increased in July 2009, as she was planning to enroll for classes that started the next month.  (Tr. 231.)  On examination, she repeated herself frequently and appeared tense and anxious.  (*Id.*)  Her citalopram would be increased before her classes started.  (Tr. 230.)  In August, her mood and energy were good, and she planned to visit her family in Alabama.  (Tr. 230.)  On examination, her behavior was somewhat awkward.  (Tr. 230.)  She began evening classes, and her anxiety was under control in September 2009.  (Tr. 229.)  Her citalopram was decreased at the end of September.  (Tr. 227-28.)  Staff at Springer's transitional housing reported Springer seemed agitated in the evening.  (Tr. 227.)

Springer underwent a consultative psychological examination with Dr. Charles Cohen on January 20, 2010.  (Tr. 292-94.)[4]  Springer was apologetic throughout the examination for no apparent reason.  (Tr. 292.)  She had been living in transitional housing for two years, and she was seeing a psychiatrist once a month.  (*Id.*)  Springer generally felt anxious, particularly in crowds, she had difficulty concentrating, and she "felt nervous inside."  (Tr. 293.)  She explained that she had been in special education because she was slow.  (*Id.*)  Currently, however, she was studying  at Community College of Allegheny to be a nutritionist, and she reported having a 3.2 grade point average.  (*Id.*)  Dr. Cohen did not think Springer appeared to be intellectually challenged.  (*Id.*)  She had worked for Goodwill in Ohio in 2007, and she said she had past work

---

[1] At least one line is cut off each of the first three pages of Dr. Cohen's report.

as a building receptionist.  (*Id.*)

On examination, Springer appeared "rather anxious," and her eye contact was poor initially but then improved.  (*Id.*)  She exhibited inappropriate anxious laughter.  (*Id.*)  She complained of waking at night and low energy at times.  (*Id.*)  She did not appear depressed. (*Id.*)  She could not answer how many weeks there are in a year.  (*Id.*)  She could perform simple addition, subtraction and multiplication, but could not count serial 7s.  (*Id.*)  Her judgment was fair, and her personal grooming was good.  (*Id.*)  Springer reported that she could take a bus by herself and perform chores at the shelter.  (*Id.*)  She did not have friends or social outlets.  (*Id.*) Dr. Cohen observed that her concentration and task persistence were fairly good that day.  (*Id.*)

Dr. Cohen diagnosed mixed anxiety and generalized anxiety disorder with panic but not agoraphobia.  (Tr. 294.)  He opined that Springer's ability to manage stress was in the fair range. (*Id.*)  He did not feel her symptoms would preclude all employment, but she would be too anxious to deal with the public.  (*Id.*)  She could go to work on time and concentrate well enough to perform moderately complex tasks.  (Tr. 294-95.)  On a medical source statement form, Dr. Cohen checked boxes to indicate Springer had marked limitations interacting appropriately with the public but only moderate difficulty interacting with supervisors, co-workers, and responding to work pressure and changes in routine.  (*Id.*)  She also had moderate limitations in understanding, remembering and carrying out detailed instructions.  (Tr. 290.)

Upon referral by a vocational counselor in Iowa, Springer underwent a psychological evaluation with Dr. Frank Gersh on September 9, 2010, primarily to assess for mental retardation or learning disabilities.  (Tr. 318-20.)  Springer reported suffering symptoms of anxiety for the past two years, beginning when she could not find work.  (Tr. 318.)  She had to leave situations when she felt her heart rate increase.  (*Id.*)  She had panic attacks, most recently in June at a

crowded street festival.  (*Id.*)  Springer also reported always having difficulty with concentration.
(*Id.*)  She described multiple inattentive symptoms that were consistent with attention
deficit/hyperactivity disorder as a child.  (*Id.*)

Dr. Gersh noted Springer had been in special education since early elementary school,
and she attempted college in Pittsburgh and at Kirkwood Community College, failing at both.
(Tr. 319.)  She had worked in factories, cleaning jobs, sorting newspapers, and as a security
guard.  (*Id.*)  She often quit jobs because she was slow to learn, and she was also fired from jobs
for being too slow.  (*Id.*)  She was on general assistance since 2004, and she was homeless about
half the time since then.  (*Id.*)  Springer also reported arthritis in her hands, knees, feet and lower
back.  (*Id.*)  Nonetheless, she seemed cheerful and upbeat, laughing frequently.  (*Id.*)  She
appeared to make an effort during testing.  (*Id.*)  Based on her full scale IQ score of 71 on the
WAIS-IV, she was performing in the borderline range.  (*Id.*)  Her reading ability was in the 5th
to 7th grade level, math was at the 7th to 8th grade level, and spelling and editing were at the 3rd
to 5th grade level.  (Tr. 320.)

Dr. Gersh diagnosed borderline intellectual functioning and agoraphobia with panic
attacks.  (*Id.*)  He did not believe college was an option for Springer.  (*Id.*)  He recommended
evaluation of her capacity to work through Goodwill, where she could learn on the job or with a
job coach.  (*Id.*)

Springer began seeing a psychotherapist, Christopher Loeckle, in October 2010 at
Community Mental Health.  (Tr. 324.)  On examination, Springer's speech was rapid at times,
and her mood ranged from anxious to tearful to giddy with incongruent laughter.  (*Id.*)  She
described herself as a survivor of life's challenges.  (*Id.*)  Loeckle diagnosed social phobia and
mood disorder, NOS.  (*Id.*)  In her second session, Springer felt anxious at first, then more

comfortable as they worked on relaxation strategies.  (*Id.*)  Springer identified lifelong problems with social difficulty.  (*Id.*)  In Springer's next session, she talked about her search for a suitable job with vocational rehabilitation assistance.  (*Id.*)  Springer said anxiety limited her concentration in most social contexts, and she had learning difficulties.  (*Id.*)  On November 5, 2010, Springer was hopeful about finding a job and stable housing.  (Tr. 331.)  She wanted to attend a community college to improve her vocational skills.  (*Id.*)  In the short term, she hoped to find more social support and entertainment.  (*Id.*)  Long term, she wanted to move closer to her family.  (*Id.*)

Two weeks later, Springer had enrolled in a computer skills class where she would have support for her learning disabilities.  (Tr. 333.)  She felt excited but anxious.  (Tr. 337.)  Springer also talked about her interest in genealogy and the history of slavery, and how she could explore this.  (*Id.*) After starting classes, Springer discussed certain behaviors that she felt anxious about expressing around others.  (Tr. 341.)  At the end of January 2011, Springer expressed a great deal of anxiety about her ability to complete her classes, her frustration with her vocational counselor's lack of follow through, and her pending SSI case.  (Tr. 343.)  The next month, Springer reported she was not capable of doing her course work and would likely fail at least one class.  (Tr. 345.)  Ten days later, she was relaxed and realistic about not being able to pass her classes, but she wanted to get the most out of them.  (Tr. 347.)  She would not try school again. (*Id.*)  She was feeling much better since starting therapy, and she would reduce her visits to once a month.  (*Id.*)

Springer saw Dr. Christopher Welsh for a diagnostic assessment on March 4, 2011.  (Tr. 349-51.)  She had recently run out of Celexa, and she was feeling anxious, especially in social situations.  (Tr. 349.)  She was also having trouble sleeping, with low energy and difficulty

focusing and concentrating.  (*Id.*)  She also reported a history of carpal tunnel syndrome, neuropathy in her feet, and occasional low back pain.  (Tr. 350.)  Her eye contact was poor, and her mood was anxious.  (*Id.*)  Dr. Welsh diagnosed social phobia and assessed a GAF score of 55-60.  (*Id.*)  He prescribed Celexa.  (*Id.*)  Several days later, Springer was feeling well despite her difficulties in school.  (Tr. 352.)  She continued to research her family history and hoped to move nearer to her family in the summer.  (*Id.*)

On April 7, 2011, Springer continued to feel very uncomfortable around other people, making it difficult for her to go to school.  (Tr. 354.)  She was mildly dysphoric and had some difficulty with insomnia.  (*Id.*)  She expected to fail one class but still hoped to pass her word processing class.  (*Id.*)  Dr. Welsh increased her Celexa.  (*Id.*)

###    B.    Physical Impairments

Springer saw her primary care physician in September 2009, and reported that she had been falling down over the last month due to pain in her legs.  (Tr. 260.)  Springer was prediabetic.  (*Id.*)  She was 5' 3" and weighed 178 pounds, with a body mass index of 31.18.[5]  She had stopped falling the next month, but her muscles were tight from the hip down.  (Tr. 256.)  She also reported progressive weakness in her ankles and numbness in her hands and feet, present for one year.  (Tr. 256.)  Dr. Yaaquov Abrams diagnosed myalgia and myositis.  (Tr. 258.)  He recommended follow up in neurology and rheumatology.  (*Id.*)  Springer had a lumbar MRI on October 23, 2009.  (Tr. 280-81.)  The impression from the MRI was multilevel degenerative changes and mild neural foraminal narrowing, without evidence of significant central canal stenosis.  (*Id.*)

---

[5] A body mass index of 30 and higher indicates obesity.  National Heart, Lung and Blood Institute, available at http://www.nhlbi.nih.gov/guidelines/obesity/BMI/bmicalc.htm

C.    **State Agency Physician Opinions**

In January 2010, Dr. Emanuel Schnepp reviewed the medical records in Springer's Social Security disability file at the request of the Social Security Administration ("SSA").  (Tr. 296-312.)  He opined that Springer's mental impairments caused no limitations in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation.  (Tr. 310.)  Dr. Schnepp did not find a formal diagnosis of learning disability in the record, and he did not believe Springer met the "capsule definition" of mental retardation due to her "fairly high level of adaptive behavior, which includes being independent with activities of daily living, having worked competitively on a sustained basis in the past, and attending Community College at this time."  (Tr. 312.)  Dr. Schnepp felt that Dr. Cohen had overstated Springer's limitations in making personal and social adjustments because he relied heavily on Springer's subjective complaints.  (Tr. 298.)  Dr. Schnepp concluded that she could make simple decisions, understand, remember and carry out very short and simple instructions, maintain socially acceptable behavior, sustain an ordinary routine without special supervision, and function independently in production-oriented jobs requiring little decision making.  (*Id.*)  In sum, he opined that Springer could meet the basic mental demands of competitive work on a sustained basis.  (Tr. 299.)

D.    **Function Report**

Springer completed a function report for the SSA in December 2009, in connection with her application for SSI.  (Tr. 180-87.)  Springer was living in a transitional housing shelter with fifteen other women, and she went to college three days per week.  (*Id.*)  She cleaned her room at the shelter, performed her assigned chore, and did her laundry weekly.  (Tr. 180, 182.)  She needed help cleaning the bathrooms because bending or stooping caused pain.  (Tr. 182.)  She

was able to shop for personal items on her own.  (Tr. 183.)  Springer described her functional

limitations.  (Tr. 185.)  She could lift less than ten pounds and needed to rest after walking.  (*Id.*)

She did not handle stress well, and stress caused tension and pain in her neck and shoulders.  (Tr.

186.)  Springer could follow simple instructions.  (Tr. 185.)

     **E.**      **Hearing Testimony**

     At the time of the administrative hearing on May 2, 2011, Springer was 48-years-old.  (Tr.

28-29.)  She has a high school education, but she was in special education.  (Tr. 29.)  It was

difficult for her to find work because standing for a long time caused her legs to hurt.  (Tr. 30.)

She had trouble finding a job that allowed sitting.  (Tr. 31.)  At the time of the hearing, Springer

was taking a computer class but failing.  (Tr. 30-31.)  She went to class two-and-a-half-hours per

week to learn to use a computer.  (Tr. 33.)  She knew how to check email and browse the Web.

(*Id.*)  She had some trouble spelling, but she could read a newspaper without a problem.  (Tr. 34.)

She could do simple math, but she could not always figure out how to make change.  (*Id.*)  She

had been let go from jobs because due to poor performance.  (Tr. 32.)

     Springer had been living in a homeless shelter and was assigned a caseworker.  (Tr. 31.)

The caseworker helped Springer get a temporary job at Goodwill to see if Springer could do the

work.  (*Id.*)  Springer was unable to complete the assignment because her legs hurt.  (*Id.*)  At the

time of the hearing, she lived by herself in a single room, which she was able to keep clean.  (*Id.*)

She went to soup kitchens for meals.  (*Id.*)  Springer said she first suffered anxiety when she

became homeless, and she started taking anti-anxiety medication.  (Tr. 35.)  Her anxiety was no

longer as severe as it had been.  (*Id.*)  She sometimes had panic attacks even when she was taking

her medication.  (Tr. 36.)  Doing homework or having something to think about overwhelmed her

and caused panic.  (*Id.*)  Her anxiety did not interfere with getting along with coworkers.  (*Id.*)

She suffered anxiety while working at Goodwill because she felt claustrophobic or crowded by too many people around.  (Tr. 37.)  When she felt pressured to do something, she became anxious and could not focus.  (Tr. 42.)

Approximately two months before the hearing, Springer had a factory job, putting boxes together.  (Tr. 38-39.)  She only worked for three days because her legs gave out from standing.  (Tr. 39.)  She could only stand for ten minutes.  (*Id.*)  The pain was in her feet, ankles and legs.  (*Id.*)  If she sat for long and then stood up, she had trouble standing.  (Tr. 40.)  She could walk for about a half hour before her legs hurt.  (Tr. 41.)

On an average day, Springer showered, dressed, ate, made her bed and went to the library to use a computer.  (Tr. 43.)  She went to a soup kitchen to eat, and went home to listen to music.  (*Id.*)  She also went to school.  (*Id.*)  Springer had a caseworker who helped her arrange appointments.  (*Id.*)  She did not have family in town or any friends or hobbies.  (Tr. 44.)  She had been in and out of jobs and homeless shelters for seven years, causing her to suffer anxiety.  (Tr. 44-45.)

Mary Milder,[6] a case manager at the Shelter House, testified at the hearing.  (Tr. 46.)  She has a master's degree in social work.  (Tr. 49.)  Her job entailed helping people reach their highest level of self sufficiency.  (*Id.*)  She had worked with Springer for a year-and-a-half.  (*Id.*)  Springer had attempted a job on a production line but after two-and-a-half shifts, her ankles were swollen, and she felt overwhelmed.  (*Id.*)  Her biggest barrier to employment was her slow pace of learning and working.  (Tr. 47.)  Springer's anxiety also made it difficult for her to concentrate.  (*Id.*)  When Springer began working at Goodwill, her rate of work was fair, but after a month or

---

[3] The hearing transcriber spelled the caseworker's name "Mylar" but the ALJ indicated her name was "Milder."  (Tr. 18.)

two she slowed down to 40-60% production. (Tr. 48.) Milder opined that Springer would need

supportive employment to keep her focused and producing. (*Id.*) She also explained that

Springer was very pleasant to get along with on a one-on-basis, but she did not do well in crowds.

(Tr. 50-51.)

Milder had taken Springer for testing, and Springer scored 71 on an IQ test. (Tr. 49.)

Milder knew from Springer's records that her intelligence scores had been lower when she was

younger. (*Id.*) The ALJ asked Milder what she knew about Springer getting a 3.2 grade point

average in a nutrition program at the Community College of Allegheny County, as Springer

reported to Dr. Cohen earlier. (Tr. 50.) Milder said she was confused about that notation in the

record. (Tr. 50.) Milder knew Springer had come to Iowa City to study nutrition, but she was not

accepted at the University of Iowa. (*Id.*) She was now failing basic computer courses at a

community college. (*Id.*)

Roger Marquardt testified at the hearing as a vocational expert "VE". (Tr. 51-56.) The

ALJ posed a series of hypothetical questions about Springer's ability to work. For the first

hypothetical question, the ALJ asked the VE to assume a 48-year-old female who had a GED and

Springer's past relevant work; who could lift twenty pounds occasionally, ten pounds frequently,

sit and stand for two hours at a time each for six hours of an eight-hour workday; walk three

blocks; no climbing ladders, ropes or scaffolds; no work at heights; no contact with the general

public, and limited contact with fellow workers. (Tr. 52.) Marquardt testified that such a person

could perform Springer's past jobs of laborer/salvage and material handling, as Springer had

performed those jobs. (Tr. 52-53.) Marquardt testified that Springer did not have transferable

skills. (Tr. 53.) He also testified, based on the first hypothetical question, that the individual

could perform unskilled jobs of small products assembly,[7] cleaner in lodging facilities,[8] and labeler/ticketer.[9]

      For a second hypothetical question, the ALJ asked the VE to assume a person of the same age, education and past relevant work as in the first hypothetical, but who was limited to lifting ten pounds occasionally and five pounds frequently, sitting and standing two hours at a time for six hours each in an eight-hour workday, walking two blocks, no working at heights, no contact with the general public, and limited contact with coworkers.  (Tr. 53.)  Marquardt testified that such a person could not perform Springer's past relevant work.  (Tr. 54.)  Such a person, however, could perform sedentary work such as surveillance monitor,[10] bench assembler in electronics,[11] and addresser.[12]  (*Id.*)

      Springer's counsel added the following limitations to the first hypothetical question: the claimant has an IQ of 71, math skills at a 7th grade level, and spelling skills at a third grade level.  (*Id.*)  Counsel asked whether this would change the number of unskilled jobs available, and Marquardt testified that it would not.  (Tr. 54-55.)  Springer's counsel then added additional

---

[4] Dictionary of Occupational Titles ("DOT") Code 729.687-010, with over 6,000 such jobs in Iowa, and 865,000 jobs in the U.S. economy.

[5] DOT Code 323.687-014, with 10,000 such jobs in Iowa, and 850,000 jobs in the U.S. economy.

[6] DOT Code 920.687-126, with 7,000 such jobs in Iowa, and 767,000 such jobs in the U.S. economy.

[7] DOT Code 379.367.010, with 400 such jobs in Iowa, and 14,000 such jobs in the U.S. economy.

[8] DOT Code 017.684-010, with 1,000 such jobs in Iowa, and over 60,000 such jobs in the U.S. economy.

[9] DOT Code 209.587-010, with 1,500 such jobs in Iowa, and 191,000 such jobs in the U.S. economy.

limitations to the hypothetical question, including moderate difficulties interacting appropriately with supervisors, moderate difficulties responding to work pressures, and moderate difficulties responding appropriately to changes in the work environment.  (Tr. 55.)  If the definition of moderate meant the individual was still able to function satisfactorily, Marquardt would not change his testimony of the jobs that would be available.  (*Id.*)

Counsel asked Marquardt to assume the individual in the first hypothetical question was unable to complete jobs in a timely manner.  (*Id.*)  Marquardt then testified that the jobs would be precluded.  (*Id.*)  The jobs would also be precluded if the person was absent three days per month. (*Id.*)  Finally, counsel asked Marquardt if any of the jobs could be performed competitively with a job coach.  (*Id.*)  Marquardt testified that employers would not generally allow a job coach.  (Tr. 56.)

**F.    The ALJ's Decision**

The ALJ issued his decision denying Springer's application for SSI on July 1, 2011.  (Tr. 8-25.)  The ALJ followed the five-step sequential evaluation set forth in the agency's regulations. *See* 20 C.F.R. § 416.920.  At the first step of the evaluation process, the ALJ determined that Springer had not engaged in substantial gainful activity since October 27, 2009, the application date.  (20 C.F.R. § 416.971 *et seq.*) (Tr. 13.)  At the second step of the process, the ALJ found that Springer had severe impairments of degenerative disk disease; obesity; generalized anxiety disorder; and panic disorder.  (20 C.F.R. § 416.920(c)).  (*Id.*)

At the third step of the evaluation, the ALJ determined that Springer did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926)).  (Tr. 14.)  The ALJ found Springer did not meet or equal listing 12.06 for anxiety

disorders because she did not meet the "B Criteria" of the listing, requiring two of the following: marked restriction in activities of daily living, marked difficulty in maintaining social functioning, marked difficulty in concentration, persistence or pace, or repeated episodes of decompensation, each of extended duration. (*Id.*) The ALJ found Springer had no restrictions in activities of daily living, moderate difficulties in social functioning and concentration, persistence or pace, and no episodes of decompensation. (*Id.*) The ALJ also found the paragraph C criteria were not present. (*Id.*)

At the next step of the evaluation process, the ALJ determined that Springer had the residual functional capacity to:

> perform light work as defined in 20 CFR 416.967(b) such that she can lift and carry twenty pounds occasionally, ten pounds frequently; sit for two hours in an eight hour workday; walk three blocks; she can never climb ladders, ropes or scaffolds; never work at heights; and she can have no contact with the general public and limited contact with coworkers.

(Tr. 14-15.)

In making this finding, the ALJ reviewed Springer's treatment records from September 2008 through April 2011, and stated "the doctors who treated the claimant during this time frame did not provide any opinions regarding the claimant's severe medically determinable impairments or any limitations which would flow from such impairments." (Tr. 15-16.) The ALJ summarized Dr. Cohen's psychological consultative report and gave great weight to Dr. Cohen's opinion "due to the objective analysis and reasoned bases for his decisions." (Tr. 16-17.)

The ALJ next considered Dr. Schnepp's January 2010 opinion based on his review of Springer's medical history. (Tr. 17.) Although Dr. Schnepp was a nontreating consultant, the ALJ gave his opinion significant weight because it was generally consistent with the record as a

whole. (*Id.*) Dr. Schnepp stated Springer did not meet the criteria for the capsule definition of mental retardation in light of her "fairly high level of adaptive behavior, which included being independent with Activities of Daily Living (ADLs) having worked competitively on a sustained basis in the past, and attending community college at the present." (*Id.*)

The ALJ also considered the evaluation and testing performed by Dr. Gersh. (*Id.*) The ALJ concluded "the claimant underwent this evaluation not to determine her impairments and resulting limitations but for vocational rehabilitation. Nonetheless, the undersigned has read and considered Dr. Gersh's evaluation and resulting assessment." (Tr. 18.) The ALJ acknowledged but discounted the testimony of Springer's caseworker, Mary Milder, because Milder "is not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms; thus, the accuracy of her testimony is questionable." (*Id.*)

The ALJ next considered the credibility of Springer's subjective complaints. (Tr. 18-20.) The ALJ found Springer's daily activities were not consistent with her claim of disabling symptoms and limitations. (Tr. 19.) Springer could perform personal grooming, do housework, shop, use public transportation, attend church, visit the library, attend college, and get along with others. (*Id.*) The ALJ also gave great weight to the opinions of the state agency consultants, finding they had "adequately considered the evidence of record" and their opinions were "internally consistent and consistent with the evidence as a whole." (Tr. 19-20.) In sum, the ALJ found the RFC was supported by the objective evidence because the treatment notes reflected only moderate symptoms. (Tr. 19.) Springer's subjective complaints were not credible due to her daily activities. (Tr. 20.)

The ALJ found Springer was able to perform her past relevant work as a laborer/salvage

and material handler, as actually performed by the claimant.  (20 C.F.R. § 416.965).  (*Id.*)  Thus, the ALJ determined Springer was not under a disability, as defined in the Social Security Act, from October 27, 2009 through the date of the decision.  (20 C.F.R. § 416.920(f)).  (Tr. 20-21.)

## II.    STANDARD OF REVIEW

The claimant bears the burden of proving his or her entitlement to disability benefits.  20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Review by this Court is limited to a determination of whether a decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g);  *Davidson v. Astrue*, 578 F.3d 838, 841 (8th Cir. 2009).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Brace v. Astrue*, 578 F.3d 882, 884 (8th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted)).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  *Id.*

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (if supported by substantial evidence, the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.)  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  *Gavin*, 811 F.2d at 1199.

18

### III.    DISCUSSION

Springer makes five arguments in support of summary judgment.  First, Springer contends that the ALJ erred by not including borderline intellectual functioning in her severe impairments and by failing to include mental limitations in the hypothetical question to the VE.  Second, Springer asserts she met or equaled the requirements of Listing 12.05C, and the ALJ failed to consider this issue.  Third, Springer contends the ALJ erred because although he found her anxiety disorder resulted in moderate difficulties in maintaining concentration, persistence or pace, he did not include any mental limitations from this deficit in the hypothetical question to the VE.  Fourth, Springer asserts the ALJ failed to properly evaluate her caseworker's opinion according to Social Security Ruling ("SSR") 06-3p.   Fifth, Springer contends the ALJ erred by finding she could perform her past relevant work as a laborer/salvage and material handler because her earnings from those temporary jobs did not rise to the level of substantial gainful activity.

### A.    Borderline Intellectual Functioning as a Severe Impairment.

Borderline intellectual functioning should be considered a severe impairment when the diagnosis is supported by sufficient medical evidence.  *Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007) citing *Hunt v. Massanari*, 250 F.3d 622, 625-26 (8th Cir. 2001).  "Borderline intellectual functioning describes individuals with IQ between 71 and 84."  *Holz v. Apfel*, 191 F.3d 945, 947 (8th Cir. 1999) (citing *Thomas v. Sullivan*, 876 F.2d 666, 668 n. 1 (8th Cir. 1989)).  Dr. Gersh diagnosed borderline intellectual functioning, and Springer's score of 71 on the WAIS-IV intelligence test administered by Dr. Gersh, in combination with Springer's school records reflecting slightly lower IQ test results over the years, is sufficient medical evidence to establish the diagnosis.  The error of not including borderline intellectual functioning as a severe

impairment was not harmless because the ALJ did not include the impairment or any similar cognitive impairment in his list of Springer's severe impairments in the hypothetical question to the vocational expert.  *See Graff v. Astrue*, 615 F.3d 932, 940 (distinguishing *Nicola* where ALJ included claimant's diagnosed learning disorder in the list of claimant's severe impairments).

Furthermore, the ALJ's error was not cured by counsel asking the vocational expert if his testimony would be different if the claimant had an IQ of 71, because an IQ score alone does not describe the concrete consequences of the mental impairment.  *See Pickney v. Chater*, 96 F.3d 294, 297 (8th Cir. 1996) (hypothetical vocational question must contain concrete consequences of the claimant's borderline intellectual functioning and vocational expert could not assume mental impairments were irrelevant for performance of unskilled jobs.)  Therefore, remand is required.

**B.       Listing 12.05C.**

Springer asserts the ALJ failed to consider whether her impairments met or equaled the requirements of Listing 12.05C.  Springer contends she met listing 12.05C because she had full scale IQ scores of 68, 69 and 70 as a child, and 71 as an adult, for an average IQ of 70 or less.  Even if the ALJ considered only her IQ of 71 as an adult, Springer argues she equaled the listing when her other impairments were considered.

The Commissioner contends Springer's impairments do not meet or equal Listing 12.05C because her IQ score was 71, one point higher than the score required to meet Listing 12.05C.  Regarding Springer's argument that she equals Listing 12.05C, the Commissioner asserts Springer does not meet the requirement of deficits in adaptive functioning based on her daily activities, past work experience, and college attendance.  Furthermore, the Commissioner contends Springer's social difficulties would not prevent her from performing a wide variety of jobs, and her concentration, persistence or pace impairment did not "preclude her from

performing the basic mental demands of competitive work on a sustained basis", according to Dr. Schnepp.

In reply, Springer asserts her IQ of 70 in 1978 is valid under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00(D)(10), and that score meets the listing requirement.  Furthermore, Springer contends her school records provide evidence of significantly subaverage intellectual functioning and deficits in adaptive functioning, because she was in special education classes, and in eighth grade, her word recognition, spelling and arithmetic were at a third grade level. Additionally, she had difficulty finding words to express ideas, and she was very slow in all response modalities.  Springer also contends her moderate difficulties in concentration, persistence or pace were enough to demonstrate deficits in adaptive functioning.  Springer argues the ALJ erred by relying on Dr. Schnepp's opinion because Dr. Schnepp had not reviewed the IQ scores.  Finally, Springer contends the ALJ's failure to consider whether she had a combination of impairments equal to Listing 12.05C was reversible error.

When a claimant meets or equals a listed impairment, she will be found disabled without further evaluation.  20 C.F.R. § 404.1520(a)(4)(iii).  The version of Listing 12.05 in effect at the time of the ALJ's decision[13] provides:

> Mental Retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C or D are satisfied.
> . . .
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70,

---

[10] 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05 (2011), available at HeinOnline.

and a physical or other mental impairment imposing an additional
and significant work-related limitation of function.

IQ tests results tend to stabilize by age sixteen.  20 C.F.R. § 404. Subpart P, App. 1. §

112.00(D)(10).  Slightly higher IQs, 70-75, in the presence of other disorders that impose

additional and significant work-related limitations may support an equivalence determination.

POMS DI 24515.056; *and see Berger v. Apfel*, 200 F.3d 1152, 1161 (8th Cir. 2000) (the ALJ

should consider the POMS guidelines).  The requirements in the introductory paragraph of Listing

12.05 are mandatory and require the claimant to demonstrate deficits in adaptive functioning that

initially manifested before age 22.  *Cheatum v. Astrue*, 388 Fed.Appx. 574, 576 (8th Cir. 2010)

(per curiam).

In this case, the ALJ never mentioned Springer's IQ scores.  Typically, remand would be

required.  *See Chunn v. Barnhart*, (past work at factory alone did not undercut mental retardation,

and case was remanded where ALJ did not mention 12.05C other otherwise indicate he considered

Listing 12.05C).   But here, substantial evidence in the record establishes that Springer's

borderline intellectual functioning, her anxiety disorder, and her degenerative disc disease

establish medical equivalence to Listing 12.05C when her highest IQ score is considered.  *See*

*Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003) (finding medical equivalence to 12.05C

where IQ was 72;  anxiety, dependency and depression would significantly interfere with ability to

work; and claimant also had physical limitations from degenerative joint disease.)

Although the ALJ did not mention Springer's IQ scores or Listing 12.05C, he credited Dr.

Schnepp's RFC opinion.  Dr. Schnepp is a nonexamining state agency consultant, and as such, his

opinion is generally entitled to less weight than the opinion of an examining source.  20 C.F.R. §

404.1527(c)(1).  The weight given to a nonexamining source opinion depends on the degree to

22

which they provide supporting explanations, and the degree to which they considered all of the

pertinent evidence, including opinions of treating and other examining sources.  *Id.* §

404.1527(c)(3).  After Dr. Schnepp reviewed Springer's medical records and gave his RFC

opinion, Dr. Gersh administered IQ tests.  Springer's IQ test results were consistent with her IQ

testing as a child, and with her history of special education.   The ALJ credited Dr. Schnepp's

opinion, finding it consistent with the evidence as a whole, but Dr. Schnepp did not have all of the

pertinent evidence available.

The ALJ also credited Dr. Cohen's opinion.  Dr. Cohen examined Springer, but he also did

not have the benefit of reviewing Dr. Gersh's testing and evaluation of Springer.  Dr. Cohen

discounted Springer's history of special education because she told him she was maintaining a 3.2

grade point average in community college.  Assuming Springer's grade point average was accurate

when she reported it, the record, including Dr. Gersh's notes and the testimony of Springer and

Ms. Milder, establishes that Springer ultimately failed all of her college attempts.  Given her valid

IQ test score of 71 on September 9, 2010, and her subsequent failure of college courses, of which

Dr. Cohen did not have knowledge, Dr. Cohen's opinion was inconsistent with the record as a

whole and should not have been credited by the ALJ.

To meet or equal Listing 12.05C, the claimant must establish deficits in adaptive

functioning prior to age 22.  *See Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006) (the listing

requires that deficits in adaptive functioning are present before age 22, but a formal diagnosis of

mental retardation is not required.)  Springer's enrollment in special education from first grade

through high school, and notes in her school records establishing she was very slow in all response

modalities support a finding of deficits in adaptive functioning present before age 22.

Furthermore, consistent with notes in Springer's adult medical records reflecting poor

social skills, bizarre behavior, and inappropriate laughter, Springer was noted to have episodes of inappropriate laughter as a child, suggesting behavioral/emotional deficits beginning before age 22.  Springer also had a history of being fired or quitting jobs when she was about to be fired because she was too slow.  This led to Springer becoming homeless off and on beginning in 2004. It is to Springer's credit that she attempted to gain employment skills through several attempts at college, but the record shows that she failed at college, and the pressure caused her significant anxiety.  Substantial evidence in the record, therefore, establishes deficits in adaptive functioning beginning prior to age 22.

Finally, Springer's physical limitations based on degenerative disc disease establish the listing requirement of an additional impairment that provides a significant work-related function. *See Shontos*, 328 F.3d at 424 (record established claimant had physical functional limitations due to degenerative joint disease).  Consistent with this finding, Springer testified that she had difficulty finding work she was mentally capable of performing that did not require her to be on her feet all day.  The record establishes all criteria for medical equivalence to Listing 12.05C. Under the circumstances, remand for calculation and award of benefits is the appropriate remedy. *Shontos*, 328 F.3d at 427.  Springer's remaining arguments are moot.[14]

---

[13] Although the Court need not reach Springer's arguments at steps 4 and 5 of the disability evaluation process, the Court notes Ms. Milder's testimony was deserving of greater weight under the factors listed in 20 C.F.R. § 404.1527(c).  Milder worked with Springer as a caseworker for a year-and-a-half, longer than any other provider.  Milder had particularized knowledge of Springer's ability to work because Milder's job was to help Springer obtain the highest level of self sufficiency, including helping her find work she could perform.  Milder had knowledge of and insight into Springer's failed work attempt at Good Will.  Milder's opinion took into account her knowledge of Springer's IQ scores, special education and recent attempts at college courses.  The ALJ discounted Milder's opinion because it is not a medical opinion, but Milder has a master's degree and experience in social work, and she has more knowledge of Springer's abilities than Dr. Schnepp who never met Springer, and Dr. Cohen, who examined Springer once.

**IV.     RECOMMENDATION**

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT:**

1.     Plaintiff's Motion for Summary Judgment [Docket No. 15] be **GRANTED**,

and the case be remanded for reversal and award of benefits;

2.     Defendant's Motion for Summary Judgment [Docket No. 21] be **DENIED;**

3.     The case be dismissed, and judgment be entered.

Dated: December 26, 2013          ___s/Arthur J. Boylan_____
                                  ARTHUR J. BOYLAN
                                  United States Chief Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before January 13, 2014.